# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Alvarez*, 2012 IL App (1st) 092119

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HERIBERTO ALVAREZ, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-09-2119 |
| Filed<br>Rehearing denied | May 1, 2012<br>June 18, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions and sentences for felony murder predicated on home invasion and attempted first degree murder, the appellate court upheld the trial court's finding that defendant was guilty of felony murder during a home invasion in which he fatally shot the woman with whom he previously lived, that the sentence for felony murder was not an abuse of discretion, regardless of defendant's contention that the mitigating factors outweighed the aggravating factors, and that the State's failure to timely file its notice of intent to seek the death penalty was rendered moot by the trial court's decision not to impose the death penalty; however, the mittimus was corrected to reflect an additional day of presentence credit. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CR-26636; the Hon. John J. Fleming, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on Appeal: Michael J. Pelletier, Alan D. Goldberg, and Jonathan Krieger, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Sally L. Dilgart, Assistant State's Attorneys, of counsel), for the People.

Panel: JUSTICE HARRIS delivered the judgment of the court, with opinion.

Presiding Justice Quinn and Justice Cunningham concurred in the judgment and opinion.

## OPINION

¶ 1 Defendant, Heriberto "Eddie" Alvarez, was charged with home invasion, first degree murder, aggravated battery, and attempted first degree murder in a 20-count indictment. After a bench trial, the circuit court found defendant guilty as charged. The circuit court merged the home invasion, aggravated battery and various murder counts before entering a judgment of conviction for felony murder predicated on home invasion (720 ILCS 5/9-1(a)(3) (West 2008)), and attempted intentional murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2008)). The circuit court sentenced defendant to a 40-year prison term for felony murder predicated on home invasion with a mandatory 25-year firearm enhancement (730 ILCS 5/5-8-1(d)(iii) (West 2008)) for a 65-year prison term. For the attempted murder conviction, the circuit court sentenced defendant to a nonenhanced eight-year prison term to be served consecutively to his conviction for felony murder predicated on home invasion. Defendant received credit for time served.

¶ 2 Defendant raises the following issues on appeal: (1) whether the State proved his guilt beyond a reasonable doubt for his conviction for first degree murder; (2) whether the circuit court abused its discretion in sentencing defendant on his first degree murder conviction; (3) whether he is entitled to a new sentencing hearing based on the State's violation of Illinois Supreme Court Rule 416(c) (Ill. S. Ct. R. 416(c) (eff. Mar. 1, 2001)); and (4) whether this court should correct the mittimus to include one more day of presentence credit.

¶ 3 We hold that the evidence was sufficient to prove defendant's guilt, that the circuit court did not abuse its discretion in sentencing defendant, and that defendant's challenge to the State's violation of Rule 416(c) is moot. We agree that defendant's mittimus should be corrected to reflect one more day of presentence credit.

¶ 4 JURISDICTION

¶ 5 The circuit court sentenced defendant on July 16, 2009. On July 29, 2009, the circuit court denied defendant's motion to reconsider his sentence, and defendant timely filed his

notice of appeal. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

¶ 6                                                          BACKGROUND

¶ 7        Defendant was charged with home invasion, the first degree murder of Judith Crespo, and the aggravated battery and attempted first degree murder of David Rios in a 20-count indictment. Defendant was arraigned on December 6, 2005. On November 3, 2006, the State filed its notice of intent to seek the death penalty.[1] Defendant waived his right to a jury.

¶ 8        At trial, the State called David Rios to the stand. David testified that he first knew Judith Crespo as a friend before starting a dating relationship with her. He had known defendant a few years as a casual friend, a baseball player, and from work. On October 23, 2005, he was at Crespo's apartment eating dinner when defendant "came to the window and I heard a commotion." David stated he was in the dining room and defendant was "[c]limbing through the window" to his left. David then "jumped off" the chair he was sitting in and ran to defendant and kicked him, whereupon, defendant "fell back," outside of the house. David then heard defendant on the back porch a short time later. He yelled for his daughter Ashley Rios to call the police and for his nephew to go upstairs. He then went to see where Crespo had gone and found her in the back holding the door in the kitchen. David saw defendant on the other side of the window. David testified that he helped Crespo hold the door closed but she was also running back and forth screaming at defendant to leave.

¶ 9        David went to the kitchen counter to get a knife, but by the time he returned to the back door, it had been kicked in and defendant was pointing a gun at him. He put both hands up by his face. He then felt a bullet through his hand. He ran to Crespo's bedroom and told her to run. David heard one shot. He then "creeped up" to the side of the bedroom whereupon defendant appeared with a gun and shot him two or three more times on his side. He was lying on the bedroom floor and defendant pointed the gun at his back, stated "Mother flower sorry," and shot him once more. His daughter came and picked him up, and they went to the front porch, where he collapsed. The next thing he remembered was waking up at the hospital.

¶ 10        David testified that as a result of his gunshot wounds, he has a bullet lodged in his chest and he suffers from continuous problems. Because of the shooting, he had to undergo a

---

[1]In the record, the State filed two documents on November 3, 2006. The first one is titled "Notice of Intent *Not* to seek the death penalty." (Emphasis added.) In the body of the notice, however, the document reads "The People of the State of Illinois *intend* to seek the death penalty against [defendant]." (Emphasis added.) The second document filed is titled "Notice Of Intent To Seek The Death Penalty." Although defendant does mention this discrepancy in his briefs before this court, it does not have any bearing on this appeal due to our hereinafter explained conclusion regarding defendant's argument concerning the State's violation of Rule 416(c) (Ill. S. Ct. R. 416(c) (eff. Mar. 1, 2001)).

kidney transplant and dialysis, and he was going blind and had trouble hearing.

¶ 11    On cross-examination, David acknowledged that he did have diabetes before the incident occurred. When asked whether his failing eyesight is due to his diabetes, he answered, "[a]s they say." David testified further that he had known defendant for a few years from work and that it was through defendant that he met Crespo. At the time of the incident, David had been dating Crespo for about six months and he was aware that she used to live with defendant. Crespo had told him that defendant had moved out about a year or so prior to the incident. David testified that it was Crespo who initially stopped defendant from coming into the home through the window, but it was he who kicked defendant when defendant attempted to enter through the dining room window. David testified Crespo shut the window on defendant. He also testified that defendant kept kicking through the window so he went to the counter to get a knife, but he was too late because defendant had already "busted through the door with the gun." David testified that at some point, he "must have dropped" the knife. Questioned further, he could not recall what he did with the knife. David also clarified that when he was in the bedroom, he was lying down when he was shot in the back. David also admitted that he was not getting along with defendant prior to the incident due to his relationship with Crespo.

¶ 12    The State next called Jesus "Jesse" Rios. Jesse testified that on October 23, 2005, he was helping his uncle David Rios move a television set to Crespo's apartment. Crespo's apartment building had two floors, and she lived on the first floor. That day David, Crespo, and Ashley Rios were at the apartment. Jesse was in the bedroom with Ashley watching a movie when defendant tried to climb in through the dining room window. Jesse testified that David kicked defendant out of the window. Crespo then ran into the kitchen because defendant was attempting to enter through the back door. Crespo was trying to hold the door closed while also calling for help. David then told Jesse to run upstairs and call the police, whereupon he ran upstairs to the landlord's apartment. He found the landlord and told him he needed to call the police. The landlord attempted to call the police, but his landline did not work so Jesse called the police using his cousin Ashley's cell phone. While Jesse was upstairs, he heard a gunshot downstairs. He heard David calling for him from downstairs. He next saw David with Ashley near the top of the stairs of the front porch. He observed David bleeding in multiple places.

¶ 13    Jesse testified that later that evening he was taken to the police station and identified defendant from photographs. Jesse went back to the police station the next day and identified defendant in a lineup. He told the detectives the defendant "shot my uncle."

¶ 14    On cross-examination, Jesse testified that he did not actually see any shooting done by defendant as he was upstairs when he heard the gunshot. Prior to the incident, he had never seen defendant before, he had not met Crespo before, and it was the first time he had been to Crespo's apartment. He believed that his uncle was moving into Crespo's apartment on the date of the incident. After David kicked defendant out of the apartment through the window, David shut the window. He did not remember Crespo being by the window. He saw David grab a knife and go toward the back door before he told him to go upstairs and call the police.

¶ 15        The State next called Ashley Rios, David's daughter. She testified she was at Crespo's apartment on October 23, 2005. David had recently started dating Crespo and Ashley had spent the night at her apartment. Jesse, her cousin, was helping David move into the apartment on that day. Specifically, they were moving a big screen television. At the time of the incident, she was with Jesse watching a movie in the bedroom and David was eating at the table in the dining room. Defendant then jumped through the window. She had known defendant from David's work and his softball team. When defendant jumped through the window, David reacted and kicked defendant back out the window. Crespo began closing windows and then ran to the kitchen while Ashley tried to calm David down. At this point, defendant ran to the back door. Ashley explained that "[t]he back door was kind of loose, I would say, because of earlier a fire department had came and kind of ruined the back doors," but she noted that the back door was "closeable." She was between the hall of the dining room and kitchen where she saw defendant at the back door. Crespo and David were trying to hold the door shut, but then David left to try to get a knife out of the drawer. At that time, defendant "forcefully" came into the apartment through the back door. She testified defendant looked "anxious" and that, "as [her] father had his hands up in surrender, began shooting my father." David walked backwards into the bedroom. She was still in the dining room area when she heard other gunshots and then saw defendant run out of the bedroom where David had been. Defendant ran toward the kitchen area. She then went to David, who was bleeding from his chest. She grabbed David and laid him out on the bed before walking him to the front door.

¶ 16        Ashley testified that she then went back into the house, where she grabbed a knife. She could not find Crespo, so she went back to David, who was sitting on the front porch. An ambulance and the police then arrived. She told the police defendant's name and identified him from a photograph array. The next day she identified defendant at the police station in a lineup.

¶ 17        On cross-examination, Ashley testified that David had been dating Crespo for "not too much" time and reiterated that David was moving into the apartment that day. David and defendant did not get along because Crespo and defendant used to date. Defendant used to live at the apartment, but she was not sure how long ago it was when defendant had lived there. David was the one that kicked defendant out of the window and then shut it. She did not tell any detectives that Crespo pushed defendant out of the window. She thought David had dropped the knife he had picked up. She saw defendant fire the first gunshot, but not the other shots. She did not see defendant shoot Crespo.

¶ 18        The State next called Jeanette Gonzalez, defendant's ex-wife, to testify. Crespo was her ex-sister-in-law. On October 23, 2005, Gonzalez called the fire department and reported a fire at Crespo's address. She did so to "distract" defendant. She was concerned and wanted to keep defendant away from the house. Between 3:30 p.m. and 4 p.m., defendant called Gonzalez's daughter, who then gave Gonzalez the phone. Defendant told Gonzalez "I'm sorry, Jay. I'm sorry" and "take care of the girls." The following exchange then occurred:

        "Q. [Assistant State's Attorney]: Do you remember him saying he did it?

        A. [Gonzalez]: He said, I did it.

I said, what did you do?

And then he said–he kept saying, I did it.

That's all."

¶ 19 On cross-examination, Gonzalez testified defendant sounded "distraught." She had seen defendant earlier in the day, and defendant looked like he had not slept and was under the influence of alcohol. His emotional state was bad and he "was a wreck." She knew defendant used to live with Crespo, but was not sure when he moved out. She learned, on the day of the incident, that David was dating Crespo. When asked whether defendant was "distraught over [Crespo] being with David Rios," she answered, "[y]es." Gonzalez testified that when she spoke to defendant between 3:30 p.m. and 4 p.m., "he was saying that, they are laughing at me and wouldn't stop."

¶ 20 The State then called Chicago police officer Cesar Valerio, defendant's second cousin. On October 23, 2005, he received a call from another cousin who told him something bad had happened and that defendant was in trouble. Officer Valerio was off duty at the time, but learned that defendant was a suspect in a homicide investigation. He received a call from defendant, who informed him that he wanted to turn himself in. He met defendant at a gas station and placed him under arrest. On cross-examination, Officer Valerio testified that he took defendant into custody without incident. He spoke to defendant several times before taking him into custody. He said defendant's behavior was "erratic" and that defendant had been crying.

¶ 21 William Moore, a forensic investigator for the Chicago police department, testified on behalf of the State. Moore responded to the scene of the incident on October 23, 2005, at approximately 4:30 p.m. with his partner. After talking to the detectives on the scene, Moore and his partner processed the scene by taking photographs and doing a walkthrough. He observed fired cartridge cases, fired bullets, a bloody knife, a pair of glasses, pieces of a door frame and several blood standards. He recovered fingerprints from the rear kitchen door. He collected blood swabs. He photographed the doors in the apartment for signs of forced entry. He found the female victim's body on the rear porch and he observed a bullet wound to her back and one to her chest. On cross-examination, Moore testified that he did not find a weapon.

¶ 22 The State next called Detective Anthony Noradan of the Chicago police department. On the day of the incident, Detective Noradan and his two partners received an assignment to investigate a shooting at Crespo's apartment. He testified that after the incident, David Rios was taken to the hospital, but Crespo's body remained on the rear porch. After arriving on the scene, he had Ashley and Jesse Rios transported to the police station and then he went to the hospital to check on the status of David Rios. His partners stayed behind and processed the scene. He spoke with David Rios at the hospital and with Ashley and Jesse Rios at the police station. He then showed Ashley and Jesse Rios a photographic array. Both Ashley and Jesse identified defendant. Later, he learned defendant had turned himself in. The next day, he arranged for Ashley and Jesse to view a lineup. They both identified defendant.

¶ 23 Several stipulations were presented. The parties stipulated that Crespo's landlord, Jorje De La Vega, if called to testify, would testify that he lived on the second floor of the

apartment building where the incident occurred. He heard two or three gunshots and then a couple more a second later. Although he tried to call the police, the landline was dead. Jesse Rios came to his front door and called the police on a cell phone. He then went downstairs and observed David Rios lying in the front doorway of the building.

¶ 24     The parties stipulated that if Mabelene Crespo were to testify, she would testify that she is Crespo's sister and that on October 22, 2005, her sister was alive. On October 23, 2005, Mabelene was notified her sister had been killed. Mabelene identified her sister's body in the Cook County morgue.

¶ 25     The parties stipulated that Courtney Melendez was employed as a forensic scientist at the Illinois State Police Crime Laboratory in the fingerprint analysis division in 2005. If called to testify, she would testify that she was not able to compare fingerprints on the cartridge cases.

¶ 26     The parties stipulated to the testimony of Angela Horn, a forensic scientist employed by the Illinois State Police Crime Laboratory in the firearms and tool mark division in 2005. If called, she would testify the four cartridges found on the scene were all fired from the same gun.

¶ 27     The parties stipulated to the testimony of Dr. Wendy Lavezzi, a medical doctor who was employed by the office of the medical examiner of Cook County as a forensic pathologist and deputy medical examiner in 2005. If called, she would testify she performed an autopsy of Crespo and that she observed one gunshot wound and four areas of abrasion on her body. In her opinion, Crespo died of a gunshot wound to her chest and the manner of death was homicide.

¶ 28     After the State rested, defendant motioned for a directed finding, which the circuit court denied.

¶ 29     Defendant testified on his own behalf. He testified that Crespo was his girlfriend of four years and that he resided at her apartment until October 22, 2005. On the night before the incident he was at a friend's house "getting drunk, getting high" and watching baseball. He testified he was drinking liquor and beer and that he "drank over a 30 pack." He was also smoking marijuana. The next morning, he went to a restaurant with his ex-wife and his kids. He had known David Rios "since the 70's" and worked with him. He had introduced David to Crespo. He had been trying to get in contact with Crespo to get his belongings from her apartment because they were going to end their relationship because she was dating David Rios. When he spoke to Crespo, she gave him permission to come to the apartment. He went to the apartment and went to the back door. He saw Crespo in the dining room window and he had a short conversation with her. Based on that conversation, he went to the back porch. When asked whether he believed he had permission to go to the back porch, defendant answered "yes."

¶ 30     Defendant testified that Crespo came outside and talked to him. He informed her that he just wanted to get his "stuff." David then "came out and started talking through the porch window, acting all crazy and stuff." He then went up to the back porch and confronted David. At this point David went back into the apartment and Crespo followed behind him. Crespo went inside the apartment to try to calm David down. When asked, "What happened

next?" defendant answered, "Well, I don't know. The door was open. I pushed it open. I went inside. I confronted [Crespo] and David in the kitchen." He did not have anything in his hands and he believed he had permission to enter the apartment. Defendant observed David reaching in a drawer in the kitchen. David pulled out two knives; one fell on the floor and one he kept in his hand. Then the following exchange occurred:

"Q. [Defendant's attorney]: Okay. What happened next?

A. [Defendant]: Well, he started talking. He started going to his left, getting behind Judy. Once he got behind Judy, he pulls [*sic*] Judy into me. As he pushed, she grabbed a pistol. The pistol went off."

Defendant testified that he carried a gun because the neighborhood is bad and that he did not take his gun out of his pocket until he saw David with a knife. Defendant testified that Crespo "dropped" and he grabbed her to put her down when he saw David coming at him with a knife. Defendant testified that he "lost it" and that "[he was] coming at me, I just came at him, I basically backed him up all the way to the other room." He then shot David because he was coming at him with a knife, testifying "he came at me with a knife, so I shot him. I was aiming for his hand. I think I got it. But he kept on coming at me, so I lit him up." When he shot David, David still had the knife in his hands. He then went back to the kitchen to see where Crespo was, but did not see her. He then ran out of the apartment.

¶ 31 After leaving Crespo's apartment, defendant testified that he dropped off the car he was borrowing and then went "cruising" with his cousin. He was "freaking out" and started drinking alcohol. He then contacted Officer Valerio to make arrangements to turn himself in. He did not learn of Crespo's death until he arrived at the police station. When he found out she had died, defendant testified he "flipped" and attempted suicide by cutting his wrist.

¶ 32 On cross-examination, defendant denied telling his ex-wife Jeanette Gonzalez that Crespo had made a fool out of him. He admitted that he saw David's van outside Crespo's apartment on the day of the incident, which was right after he had paid Crespo's rent for the month. He also admitted to calling David's cell phone several times that morning. He testified that after going to breakfast with his two daughters and his ex-wife, he had one of his daughters in the car he was driving. He drove to Crespo's apartment and saw David's car. He then dropped off his daughter at his brother's house. After the incident, when he turned himself in to the police, he told them he lived at a different address than Crespo's apartment. He also acknowledged he made about 10 phone calls to Crespo on the day of the incident, claiming that they were to arrange when he could come pick up his clothes. He denied cutting the phone lines on the property. When asked whether his "finger was around the trigger of that pistol when it went off," defendant answered "Yes, it was." Defendant testified that he "got rid of" the gun by giving "it back to my boys."

¶ 33 Defendant recalled Detective Noradan to testify on his behalf. During defendant's case, Detective Noradan testified he spoke with David Rios at the hospital after the incident. David informed him that he pushed defendant out the window. Detective Noradan testified that when he spoke with Ashley and Jesse Rios, they told him that Crespo pushed defendant out of the window. Detective Noradan also testified that he observed defendant slice his wrist with the top of an aluminum can at the police station.

¶ 34    The circuit court found defendant guilty as charged and merged the home invasion, aggravated battery and various murder counts before entering a judgment of conviction for felony murder predicated on home invasion (720 ILCS 5/9-1(a)(3) (West 2008)), and attempted intentional murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2008)). In making its ruling, the circuit court first determined whether defendant committed home invasion. The circuit court found that although defendant claimed to have lived at Crespo's apartment, he initially gave a different address to the police. The court also found that defendant went to Crespo's apartment to move his stuff out, "but felt he had to call which would indicate he didn't–wouldn't have permission to come and go as he pleased if he had to call to get permission to go there." The court further stated:

> "The testimony was clear that he had not lived there for a while. And the physical evidence, broken locks on the floor and testimony of the people that he banged through the door, shows he did not have permission to enter at that time, and he did so by force, so I think when he was going there he was at that point entering–committing a home invasion."

The circuit court found that during the home invasion, defendant committed the offense of first degree murder by personally discharging his firearm and killing Judith Crespo. The court stated:

> "I think the physical evidence corroborates the testimony that he fired at her and the physical evidence corroborates some accidental shooting. His actions before and after show an intent to go in there to do violence. After he shot Crespo–I mean even look at his testimony he was on the–even his testimony he was standing on the back porch having a conversation with Judith and David is inside and Judith goes to talk to him, and there's loud voices. And then he enters. Even in his testimony he wasn't invited in, he forced his way in there to see what was going on and injecting himself that wasn't any of his business even if you take his testimony to be true, which I don't. So there's no doubt he went in there.
>
> And after he shot Judith, he's saying there's some self-defense, but if it was an accident when he shot Judith, why is he shooting at David and chasing him when David was nowhere near him to threaten him or do physical harm and chase him into the other room?
>
> So I don't see that there is any self-defense or unreasonable belief in self-defense at all."

¶ 35    On March 9, 2009, defendant filed a motion for a new trial. Relevant to this appeal, defendant argued that the State failed to prove him guilty beyond a reasonable doubt and that the circuit court's findings were against the manifest weight of the evidence. Defendant maintained that he was acting in self-defense or in the alternative he was guilty of second degree murder. The State responded that a review of all of the evidence shows defendant was guilty of first degree murder and that he was not acting in self-defense or in the unreasonable belief in self-defense. The State specifically pointed to the evidence of defendant getting pushed out of a window, evidence that defendant forced his way into the kitchen area, and evidence of the broken door and locks. The circuit court denied defendant's motion.

¶ 36    On July 16, 2009, the circuit court found defendant eligible for the death penalty and conducted a sentencing hearing. In aggravation, the State presented Officer Behrend of the Chicago police department, who testified that on September 11, 2005, he arrested defendant for domestic battery of Crespo. He testified Crespo declined medical attention.

¶ 37    Eleni Rodriguez, Crespo's daughter, testified that on July 9, 2004, she observed Crespo and defendant engaged in a physical altercation. Rodriguez "got in the middle" of the altercation and defendant "grabbed [her] by the wrist and pushed [her] on the floor." The police were called, but defendant was not there when they arrived. She and Crespo did not receive any medical attention after the altercation.

¶ 38    By stipulation, the State presented copies of two orders of protection taken out against defendant. The first, taken out by Crespo, was issued September 12, 2005, with an expiration date of September 26, 2005. The second was taken out by Jeannete Alvarez.

¶ 39    The State presented two victim impact statements, one from Eleni Rodriguez and one from Crespo's family. A family representative read the statements. Both impact statements discussed the effect the incident had on Crespo's family. The parties stipulated that all of the State's witnesses' testimony at trial applied in aggravation.

¶ 40    In mitigation, defendant presented his presentence investigation, which showed no convictions, a work history, and a history of drug abuse. Lourdes Alvarez, defendant's sister, testified defendant had a great relationship with his children and that he helped support the children even though he was divorced from their mother. Alvarez testified that since defendant's arrest, he has expressed remorse and that "[h]e says he can't sleep at night because he hears voices." Alvarez testified further that defendant's arrest has affected his family. Defendant, in allocution, expressed remorse for his actions and apologized to Crespo's family.

¶ 41    In making its ruling, the circuit court noted that it had heard and considered the evidence at trial, the evidence in aggravation and mitigation, the presentence report, defendant's statement in allocution, the victim impact statements, and the statutory factors in aggravation and mitigation. After applying the statutory factors, the circuit court found death was not an appropriate penalty. The circuit court also noted the range of sentences defendant was eligible for, which was 20 to 60 years for murder with a mandatory additional 25 years due to defendant's personal discharge of a firearm, and 6 to 30 years on the attempted murder conviction, which would run consecutively. The court then issued defendant's sentence, stating:

        "So after having heard all the argument in aggravation and mitigation Defendant's statement and allocution which at this time he has demonstrated remorse. Reading the presentence investigation, taking into account he has no serious prior criminal history; however, there was–there was a pattern of conduct that led up to this day. On murder on count 11 which was the murder counts sentence Defendant to 65 years in the Illinois Department of Corrections. On Count 12 attempt murder count, sentence him to eight years in the Illinois Department of Corrections to run consecutive to Count 11."

¶ 42    The circuit court sentenced defendant to a 40-year prison term for felony murder predicated on home invasion with a mandatory 25-year firearm enhancement (730 ILCS 5/5-

8-1(d)(iii) (West 2008)) for a total 65-year prison term. For the attempted murder conviction, the circuit court sentenced defendant to a nonenhanced eight-year prison term to be served consecutively to his conviction for felony murder predicated on home invasion. Defendant received 1,361 days of presentence credit.

¶ 43    On July 28, 2009, defendant filed a motion to reconsider his sentence pursuant to Rule 604(d) (Ill. S. Ct. R. 604(d) (eff. Dec. 13, 2005)). In his motion, defendant argued his sentence was excessive and "did not properly take into account [his] lack of criminal convictions, mental health history, prior work history and remorse." The circuit court denied defendant's motion to reconsider his sentence.

¶ 44    Defendant timely appealed.

¶ 45                              ANALYSIS

¶ 46    Defendant has raised four issues on appeal: whether the State proved his guilt beyond a reasonable doubt for his first degree murder conviction; whether the circuit court abused its discretion in sentencing defendant on his first degree murder conviction; whether he is entitled to a new sentencing hearing based on the State's violation of Illinois Supreme Court Rule 416(c) (Ill. S. Ct. R. 416(c) (eff. Mar. 1, 2001)); and whether this court should correct the mittimus to include one more day of presentence credit. We will address each issue in turn below.

¶ 47                       Sufficiency of the Evidence

¶ 48    Defendant argues his conviction for first degree murder must be reversed because the State failed to prove him guilty beyond a reasonable doubt. Defendant contends that the State's case leaves a reasonable doubt as to his guilt because it was based on contradictory testimony by biased and impressionable witnesses. Specifically, defendant argues that the State's occurrence witness, David Rios, contradicted himself and other evidence adduced at trial during his testimony. Defendant describes David Rios's testimony as "shaded" because he was a "romantic rival" of defendant and the two had an "antagonistic relationship." Defendant argues that Ashley and Jesse Rios's testimony was not credible because they are the daughter and nephew of David Rios. Defendant describes Ashley's and Jesse's respective testimony as contradictory and influenced by David Rios's account of the incident. Additionally, defendant contends that the circuit court's findings, as expressed in its comments before announcing the verdict, were unsupported by the record. Accordingly, defendant asks this court to reverse his conviction for first degree murder predicated on home invasion.

¶ 49    The State responds that it proved the offenses of home invasion and first degree murder beyond a reasonable doubt. Specifically, the State points to defendant's testimony, Jeannette Gonzalez's testimony, the State's occurrence witnesses' testimony, and the physical evidence in arguing that it persuasively established defendant committed the offense of home invasion by entering Crespo's home without authority and personally discharged a firearm killing Crespo and causing harm to David Rios. In response to defendant's argument that the State's witnesses delivered biased testimony due to David Rios being defendant's romantic rival, the

State argues that instead of showing bias, it shows that defendant had motive to commit the crimes charged. The State characterizes any contradictions in its occurrence witnesses' testimony, as argued by defendant, as "*de minimus*" and "immaterial." The State notes that defendant does not seek to have his conviction for the attempted murder of David Rios vacated.

¶ 50    It is not the function of this court to retry a defendant when reviewing whether the evidence at trial was sufficient to sustain a conviction. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our review is focused on "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Baskerville*, 2012 IL 111056, ¶ 31.

¶ 51    The trier of fact is responsible for determining a witness's credibility and the weight to be given to a witness's testimony, as well as drawing any reasonable inferences from the evidence. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Although all reasonable inferences in the record must be given in the prosecution's favor, unreasonable inferences will not be allowed. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). The trier of fact is also in the best position to resolve any conflicting inferences produced by the evidence. *People v. McDonald*, 168 Ill. 2d 420, 447 (1995). Further, "the trier of fact is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.*; see also *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009) ("the trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt"). Additionally, the trier of fact's findings of credibility are given greater weight because it saw and heard the witnesses. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). "The testimony of a single witness, if it is positive and the witness [is] credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Circumstantial evidence can sustain a conviction, "provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged." *Hall*, 194 Ill. 2d at 330. The trier of fact's " ' "role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." ' " (Emphasis in original.) *Jimerson*, 127 Ill. 2d at 44 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 52    A defendant's conviction will not be reversed "simply because the evidence is contradictory [citation] or because the defendant claims that a witness was not credible." *People v. Siguenzo-Brito*, 235 Ill. 2d 213, 228 (2009). A defendant's conviction will only be reversed where the evidence is so unsatisfactory, unreasonable or improbable that it raises a reasonable doubt as to defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 53    After reviewing the evidence in the light most favorable to the State, we hold the State proved beyond a reasonable doubt that defendant committed first degree murder during a home invasion. In regard to home invasion, the circuit court noted that even though defendant claimed he lived at Crespo's apartment the day before the incident, he told the police he lived at a different address. The circuit court stated that defendant admitted that he

called Crespo to move his things out, actions that contradict his claim that he had permission to enter the apartment. The circuit court also pointed out that based on the testimony, defendant had not lived at the apartment "for a while." The circuit court found telling that both the physical evidence, shown by broken locks on the floor, and the testimony showed defendant had "banged through the door" and that "he did not have permission to enter at that time, and he did so by force." We agree with the circuit court's findings and conclude that they are supported by the record. David, Jesse, and Ashley Rios all testified that defendant was attempting to enter the apartment by force. Although there was a conflict in the testimony concerning who actually shut the windows after kicking defendant out, it was the circuit court's role in this case to resolve conflicts in the testimony. See *McDonald*, 168 Ill. 2d at 448-49 ("It is the trier of fact's responsibility *** to resolve conflicts in the evidence ***."). As mentioned by the court, there was also physical evidence of a forced entry as shown by the broken locks. Viewing this evidence in the light most favorable to the State, we cannot say that it was unreasonable to find that defendant committed the offense of home invasion.

¶ 54    In regard to first degree murder, the circuit court stated that although the physical evidence corroborates both the argument that defendant purposefully shot Crespo or that it was an accident, the court stressed that defendant's "actions before and after show an intent to go in there to do violence." The court stated further that "if it was an accident that he shot [Crespo], why is he shooting at David and chasing him when David was nowhere near him to threaten him or do physical harm and chase him into the other room?" Viewing the evidence in the light most favorable to the State, we cannot say that the circuit court's findings were unreasonable or unsupported by the record. It is not unreasonable to infer from David Rios's testimony that defendant shot David once in the hand, then shot Crespo, and then shot David several more times. Although defendant claims David's testimony is not credible because he and defendant were romantic rivals, it is the responsibility of the trier of fact to determine credibility and make inferences from the evidence. See *Jimerson*, 127 Ill. 2d at 43. As the court stated, defendant's actions both before and after the incident show that he went to the apartment with the intent to do violence. The court heard testimony from three witnesses that defendant was attempting to enter the home without permission, and Jeanette Gonzalez provided testimony regarding defendant's physical and emotional state before and after the incident. Our review of the evidence shows that the circuit court's findings were not so unsatisfactory, unreasonable, or improbable as to raise a reasonable doubt as to defendant's guilt. *Evans*, 209 Ill. 2d at 209.

¶ 55    Defendant bases his argument on minor conflicts in the testimony, such as whether it was Crespo or David Rios who shut the dining room window after defendant attempted to enter it; and that David's, Ashley's, and Jesse's testimony was not credible because David was defendant's romantic rival and Ashley and Jesse are related to David. However, neither contradictory evidence nor credibility assertions by the defendant will cause this court to automatically reverse defendant's convictions. See *Siguenzo-Brito*, 235 Ill. 2d at 228 ("A reviewing court will not reverse a conviction simply because the evidence is contradictory [citation] or because the defendant claims a witness was not credible ***."); *Evans*, 209 Ill. 2d at 211 ("It is the function of the trier of fact to assess the credibility of the witnesses, to

determine the appropriate weight of the testimony, and to resolve conflicts or inconsistencies in the evidence."). Based on the evidence presented, we cannot say that no rational trier of fact could have found defendant guilty. See *Baskerville*, 2012 IL 111056, ¶ 31 ("In reviewing the sufficiency of the evidence in a criminal case, our inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt."). Accordingly, the circuit court did not err when it found defendant guilty of felony murder predicated on home invasion during which defendant personally discharged a firearm that proximately caused Crespo's death.

¶ 56                                            Sentencing

¶ 57        Defendant next argues that the circuit court abused its discretion in sentencing defendant. Defendant contends that the factors in mitigation outweigh the factors in aggravation and that a minimum sentence of 45 years' imprisonment would be a more appropriate sentence. The factors in mitigation that defendant points to in making his argument include his upbringing, that he was a victim of abuse, and addicted to both drugs and alcohol, that he had no prior criminal convictions, and that he expressed remorse. Defendant asks this court to amend his mittimus to reflect a 45-year prison term for his first degree murder conviction, which would be the minimum prison term available.[2] Before this court, defendant does not challenge his sentence for his conviction of attempted murder or the mandatory 25-year firearm enhancement under section 5-8-1(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(d)(iii) (West 2008)).

¶ 58        The State responds that the circuit court did not abuse its discretion in sentencing. The State contends that although defendant did not have any criminal convictions, defendant was involved in three incidents of domestic violence and Crespo had obtained an order of protection against defendant. The State also argues that many of the factors that defendant relies upon in mitigation are self-reported because they are from his presentence investigation. Overall, the State maintains that the circuit court properly sentenced defendant in the middle of the range of sentences available to it by statute and that the 25-year firearm enhancement was automatically added to defendant's sentence as a matter of law, not at the circuit court's discretion.

¶ 59        The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Under Supreme Court Rule 615, a court of review does have the power to reduce a defendant's sentence if the circuit court abused its discretion or if the sentence was unlawful. Ill. S. Ct. Rs. 615(b)(1), (b)(4); *People v. Jones*, 168 Ill. 2d 367, 378 (1995). However, "the power to reduce a sentence should be exercised 'cautiously

---

[2]This would mean defendant would be sentenced to 20 years' imprisonment for his first degree murder conviction with the mandatory 25-year firearm enhancement under section 5-8-1(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(d)(iii) (West 2008)), for a total of 45 years' imprisonment.

and sparingly.' " *Jones*, 168 Ill. 2d at 378 (quoting *People v. O'Neal*, 125 Ill. 2d 291, 300 (1988)). If a sentence is within the statutory limits, a court of review will not alter that sentence unless the trial court abused its discretion. *People v. Coleman*, 166 Ill. 2d 247, 258 (1995).

¶ 60    A circuit court's sentencing decision is given "substantial deference" because the sentencing court, "having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. Our supreme court has warned that "[i]n considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). Further, "[a] sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Id.* at 54; see also *People v. Pippen*, 324 Ill. App. 3d 649, 651-52 (2001) ("A court has abused its discretion when the record shows the sentence is excessive and not justified under any reasonable view of the record.").

¶ 61    We find the circuit court did not abuse its discretion in sentencing defendant. First, defendant does not challenge his sentence for attempted murder nor does he challenge the 25-year firearm enhancement. Before applying the firearm enhancement, the circuit court sentenced defendant to a sentence in the middle of the permissible range. The circuit court stated that it considered all the evidence at trial, in aggravation and mitigation, and allocution. The court noted that although defendant did not have any "serious prior criminal history," it was shown that there was a "pattern of conduct that led up to this day." We note that "the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *Fern*, 189 Ill. 2d at 53. After reviewing the record, we conclude these findings were supported by the record. We cannot say that defendant's sentence was excessive where he was sentenced in the middle of the permissible range and the record shows the circuit court considered all of the evidence, as well as all of the factors in mitigation and allocution. See *Pippen*, 324 Ill. App. 3d at 651-52 ("A court has abused its discretion when the record shows the sentence is excessive and not justified under any reasonable view of the record."). Accordingly, we hold that the circuit court did not abuse its discretion in sentencing defendant.

¶ 62                      Illinois Supreme Court Rule 416(c)

¶ 63    Defendant next contends that his sentence should be vacated and the cause should be remanded for a new sentencing hearing because the State was over 200 days late in filing its notice of intent to seek the death penalty in violation of Supreme Court Rule 416(c). Ill. S. Ct. R. 416(c) (eff. Mar. 1, 2001). Defendant maintains that a new sentencing hearing is needed because the court imposed a sentence by considering an improper sentencing range and that "it is possible the circuit court would have imposed a lower sentence had it known the proper range." Defendant argues that the issue is not moot because a new sentencing

-15-

hearing could potentially reduce his sentence.[3]

¶ 64 In response, the State concedes that it did not file its notice of intent to seek the death penalty within 120 days of defendant's arraignment in violation of Rule 416(c). Ill. S. Ct. R. 416(c) (eff. Mar. 1, 2001). However, the State argues the issue is moot because the circuit court declined to impose the death penalty, and it did not impose on defendant a natural life sentence or an extended term sentence predicated on defendant's eligibility for the death penalty. The State also argues that this court is powerless to grant the relief defendant requests because the circuit court already imposed a 40-year sentence, which lies exactly at the midpoint of the 20- to 60-year range for nonenhanced sentences for first degree murder. 730 ILCS 5/5-4.5-20(a) (West 2008). In making its argument that the issue is moot, the State points out that the public interest exception to the Illinois mootness doctrine does not apply in this case.

¶ 65 Rule 416 addresses procedures to be followed in capital cases. Ill. S. Ct. R. 416 (eff. Mar. 1, 2001). Rule 416(c) provides, in relevant part:

"(c) *** The State's Attorney or Attorney General shall provide notice of the State's intention to seek or reject imposition of the death penalty by filing a Notice of Intent to Seek or Decline Death Penalty as soon as practicable. In no event shall the filing of said notice be later than 120 days after arraignment, unless for good cause shown, the court directs otherwise." Ill. S. Ct. R. 416(c) (eff. Mar. 1, 2001).

¶ 66 On October 27, 2011, after the briefing in the case at bar was completed, our supreme court issued its *per curiam* opinion in *People v. Hill*, 2011 IL 110928. The State in *Hill* filed its notice of intent to seek the death penalty 247 days after the defendant's arraignment. *Id.* ¶ 3. The circuit court denied the defendant's subsequent motion to strike the State's notice as untimely. *Id.* The defendant was found guilty of first degree murder and home invasion. *Id.* ¶ 4. In *Hill*, the circuit court found the defendant was eligible for the death penalty and sentenced the defendant to 60 years' imprisonment. *Id.* It noted, "[t]he trial judge stated that he considered all the evidence in aggravation and mitigation" and that "[t]here is nothing in the record to indicate this decision was influenced by the fact that the defendant was death-eligible." *Id.* The defendant appealed his sentence. *Id.* ¶ 5. This court affirmed defendant's conviction and sentence. See *People v. Hill*, 402 Ill. App. 3d 903 (2010).

¶ 67 Our supreme court, however, after initially granting Hill's appeal (*People v. Hill*, 238 Ill. 2d 663 (2010)), dismissed the appeal as moot after hearing oral arguments on the matter. *Hill*, 2011 IL 110928, ¶ 1. The court first stated "[t]he mootness doctrine provides that we must dismiss an appeal when the issues involved have ceased to exist because intervening events have made it impossible for us to grant effectual relief." *Id.* ¶ 6. The court held:

"As the State correctly notes, however, the defendant is challenging an alleged

---

[3]We note that both parties made several other arguments, besides whether the issue was moot, when addressing this issue in their respective briefs before this court. However, after the briefing in this case was completed, our supreme court issued its *per curiam* opinion in *People v. Hill*, 2011 IL 110928, as discussed *infra*. Based on *Hill*, we do not need to address those additional arguments.

misinterpretation of a capital case rule when he did not receive a capital sentence. There is no evidence to suggest that the trial court's decision to impose a term of years was influenced in any way by the defendant's eligibility for the death penalty, and his argument to the contrary is speculative. The trial court's decision was an intervening event that made it impossible to grant the defendant relief from the State's purported violation of Rule 416(c). This appeal is moot." *Id.* ¶ 7.

Additionally, our supreme court held that the public interest exception to the mootness doctrine did not apply because the legislature had recently abolished the death penalty and, thus, "it is a question that is not likely to recur." *Id.* ¶ 8.

¶ 68    In this case, as the State readily admits, the State filed its notice of intent to seek the death penalty well after the 120-day period following defendant's arraignment in violation of Rule 416(c). Ill. S. Ct. R. 416(c) (eff. Mar. 1, 2001). However defendant, like the defendant in *Hill*, is challenging the violation of a capital rule when he did not receive a capital sentence. The circuit court in this case did not impose the death penalty, and it did not impose a natural life sentence or an extended term sentence based on defendant's eligibility for the death penalty. As the State points out, defendant received a 40-year sentence, which lies exactly at the midpoint of the 20- to 60-year range for nonenhanced sentences for first degree murder. 730 ILCS 5/5-4.5-20(a) (West 2008). Defendant points to no facts in the record, nor did we find any, that show that the circuit court's sentencing decision was in any way influenced by his eligibility for the death penalty. As in *Hill*, the circuit court's sentencing decision was an intervening event which makes it impossible for this court to remedy the State's violation of Rule 416(c). *Hill*, 2011 IL 110928, ¶ 7 ("The trial court's decision was an intervening event that made it impossible to grant the defendant relief from the State's purported violation of Rule 416(c)."). Additionally we hold, as in *Hill*, that the public interest exception to the mootness doctrine does not apply in this case. *Id.* ¶ 8 ("Rule 416(c) is a capital case rule, and the General Assembly abolished the death penalty earlier this year. Pub. Act 96-1543 (eff. July 1, 2011) (adding 725 ILCS 5/119-1). Accordingly, it is a question that is not likely to recur, and our determination of what this now-superseded rule requires is not necessary."). Accordingly, defendant's arguments regarding the State's violation of Rule 416(c) are moot.

¶ 69                                  Presence Credit

¶ 70    Defendant's final argument is that his mittimus miscalculates the time he spent in presentence custody. He requests that the mittimus be corrected to reflect an additional day of presentence credit. The State agrees with defendant, acknowledging in its brief that it "has reviewed Defendant's calculations and they are correct."

¶ 71    A criminal defendant is entitled to receive credit for time spent in custody prior to a sentence being entered. 730 ILCS 5/5-4.5-100(b) (West 2008). The day of sentencing is not included in calculating a defendant's presentence credit. *People v. Williams*, 239 Ill. 2d 503, 510 (2011). This court has the authority to correct the mittimus without remanding the case back to the circuit court. *People v. Harper*, 387 Ill. App. 3d 240, 244 (2008).

¶ 72    In this case, the mittimus lists defendant's presentence credit as 1,361 days. The parties

agree that defendant was arrested on October 23, 2005, and sentenced on July 16, 2009, and, therefore, was entitled to 1,362 days of presentence credit. We have reviewed the calculations as submitted by the parties and conclude they are correct. Accordingly, we order that the mittimus be corrected to reflect 1,362 days of presentence credit.

¶ 73                                                    CONCLUSION

¶ 74        We affirm defendant's conviction and sentence and order the mittimus corrected.

¶ 75        Affirmed; mittimus corrected.