2020 IL App (1st) 182072-U

SIXTH DIVISION
September 11, 2020

No. 1-18-2072

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 17090 |
| | ) | |
| BENJAMIN HOLT, | ) | Honorable |
| | ) | Allen F. Murphy, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Griffin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction for attempted first degree murder is affirmed. Evidence was not insufficient and sentence of 12 years in prison was not excessive.

¶ 2    Following a bench trial, defendant Benjamin Holt was convicted of attempted first degree murder and sentenced to 12 years in prison. On appeal, Mr. Holt contends the evidence was insufficient to prove him guilty of attempted first degree murder where the State did not establish he intended to kill the victim, and his sentence was excessive given his background and expression of remorse. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Mr. Holt was charged with one count of attempted first degree murder, which alleged he, without lawful justification and with intent to kill, stabbed Shannon Brown-Rice, constituting a substantial step toward the commission of first degree murder (720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014)); three counts of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2014)); and one count of aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2014)).

¶ 5      Ms. Brown-Rice testified she was dating and living with Mr. Holt, whom she identified in court, in October 2015. On October 2, 2015, Ms. Brown-Rice's 12-year-old niece, J.W., and her nine-year-old grandson, T.R., came to her house for family game night. J.W. and Ms. Brown-Rice picked Mr. Holt up from work. Mr. Holt, Ms. Brown-Rice, and J.W. went to the liquor store, where they purchased a half-pint of whiskey and an airplane bottle of alcohol for Mr. Holt, and a half-pint of cognac and beer for Ms. Brown-Rice.

¶ 6      They returned to Mr. Holt and Ms. Brown-Rice's house, T.R. arrived and began playing Monopoly with Ms. Brown-Rice and J.W. Ms. Brown-Rice drank her half-pint of cognac, and Mr. Holt drank his airplane bottle of alcohol and some of his half-pint of whiskey. Mr. Holt went to the liquor store, purchased another half-pint of whiskey, and returned home. Ms. Brown-Rice asked him if he bought her any alcohol, and he responded, "[n]o, I didn't," and, "[g]et your own." Ms. Brown-Rice told Mr. Holt he was selfish. Ms. Brown-Rice then went to the liquor store, bought a half-pint of cognac, and returned home. She continued playing games with the children for some time, then put them to bed. Ms. Brown-Rice went to her bedroom and saw Mr. Holt kneeling on the floor at the foot of the bed. She had nothing in her hands. Mr. Holt stood up and hit Ms. Brown-Rice on the right side of her face with his hand, and she fell backwards into the closet through the open closet door. Ms. Brown-Rice's head hit the rear wall of the closet,

damaging it.

¶ 7     When Ms. Brown-Rice was on the floor, Mr. Holt cut her under her neck with a knife. Ms. Brown-Rice began "kicking and asking, like begging, 'Really, you trying to kill me?' " Every time Ms. Brown-Rice kicked Mr. Holt, he cut her. Mr. Holt cut Ms. Brown-Rice's left cheek and leg. Ms. Brown-Rice covered her face with her left hand, and Mr. Holt cut the underside of her left arm, her hands, and her fingers. Ms. Brown-Rice thought Mr. Holt was trying to kill her. Ms. Brown-Rice did not strike Mr. Holt at any point during this struggle.

¶ 8     Ms. Brown-Rice called J.W. and T.R. into the bedroom, and they entered as Mr. Holt was kneeling over Ms. Brown-Rice and cutting her. J.W. told Mr. Holt to stop. Mr. Holt stopped cutting Ms. Brown-Rice after she told J.W. to call the police. Ms. Brown-Rice told the children to get out, and they left the bedroom. Mr. Holt left the house and went down the street. Ms. Brown-Rice grabbed a towel because her neck was bleeding and followed Mr. Holt to see where he was going.

¶ 9     Police arrived as Ms. Brown-Rice was walking down the street. She was transported by ambulance to Christ Hospital, where she received treatment for her injuries. Ms. Brown-Rice received more than 60 stitches to her chin and neck, and more than 100 stitches in total, including stitches to her leg and arms. At the time of trial, Ms. Brown-Rice had undergone six surgeries to repair tendons in her left middle finger. That finger became infected and if antibiotics were not effective, her finger would have to be amputated.

¶ 10    Ms. Brown-Rice identified her injuries in a series of photographs, which were taken at Christ Hospital on October 2, 2015, and which were admitted into evidence. These photographs depict an open laceration running from the center of Ms. Brown-Rice's chin to the underside of her right jawbone. The laceration is widest where the neck connects to the underside of the jaw, and tissue underneath the skin is visible. The undersides of Ms. Brown-Rice's hands have patches

of dried blood on them. Ms. Brown-Rice has a band-aid on the end of her left index finger, which she testified was applied by medical professionals. The back sides of Ms. Brown-Rice's hands also have patches of blood on them. There is a wound to the center of Ms. Brown-Rice's left check, surrounded by dried blood. The lower part of Ms. Brown-Rice's hospital gown, near the outside of her left leg, and the bed sheets are stained with blood. There are three open wounds on the underside, *i.e.*, tricep area, of Ms. Brown-Rice's upper left arm. There is an open wound to the left side of Ms. Brown-Rice's leg, which is still bleeding.

¶ 11    On cross-examination, Ms. Brown-Rice testified she was not upset when she learned Mr. Holt did not buy her anything at the liquor store. She did not argue with Mr. Holt prior to the incident in their bedroom. When Ms. Brown-Rice returned from the liquor store, she continued drinking her original bottle of cognac while playing games with the children. She also drank one can (or part of one can) of beer. The knife Mr. Holt used to cut her was a pocketknife with a black handle and a blade that opened and closed.

¶ 12    Ms. Brown-Rice testified that Mr. Holt stopped cutting her when the children left her bedroom, then he left the bedroom. Ms. Brown-Rice followed Mr. Holt to see where he was going so she could tell police his whereabouts.

¶ 13    Ms. Brown-Rice also acknowledged on cross-examination that she told a Detective Coleman she and Mr. Holt had been arguing and also acknowledged that if she told Detective Coleman this, then it was true. However, on redirect examination, Ms. Brown-Rice testified she and Mr. Holt had a discussion about money and "some issues" that night, but they did not argue

¶ 14    J.W. testified she was 15 years old at the time of trial. Ms. Brown-Rice is her aunt. On October 2, 2015, J.W. went to Ms. Brown-Rice's house for family game night. J.W. and Ms. Brown-Rice picked up Mr. Holt, whom J.W. identified in court, from his workplace. Mr. Holt, Ms.

Brown-Rice, and J.W. returned to the house, and T.R. arrived. Ms. Brown-Rice, J.W., and T.R. played Monopoly. J.W. and T.R. prepared for bed in a room down the hallway from Ms. Brown-Rice and Mr. Holt's bedroom. Ms. Brown-Rice entered the children's bedroom, said she and Mr. Holt were going for a walk, and closed the door.

¶ 15    J.W. heard a "loud boom" from Ms. Brown-Rice and Mr. Holt's bedroom. "[A] matter of seconds" later, J.W. stepped into the doorway of Ms. Brown-Rice and Mr. Holt's bedroom, accompanied by T.R. J.W. saw Ms. Brown-Rice on the floor with "a bloody mouth" and Mr. Holt "over her with a knife in his hand." The knife was a pocket knife, "black at the bottom, * * * silver at the top, and it was able to flip close[d] and open." Ms. Brown-Rice was on her back on the floor, with her legs in the air, kicking to get Mr. Holt away from her. Mr. Holt knelt over Ms. Brown-Rice and leaned toward her with the knife. Ms. Brown-Rice screamed J.W.'s name and told her to call the police. J.W. yelled at Mr. Holt to stop and he paused, but did not move away from Ms. Brown-Rice.

¶ 16    J.W. and T.R. returned to their bedroom and closed the door, and J.W. called 9-1-1. Ms. Brown-Rice "bust[ed]" open the door to the children's bedroom. J.W. saw that Ms. Brown-Rice's neck was "open" and bleeding. Ms. Brown-Rice got a towel from the bathroom, put it on her neck, and left. J.W. and T.R. remained at the house until the police arrived.

¶ 17    On cross-examination, J.W. testified that after picking up Mr. Holt from work, the family went directly home, and did not stop at the liquor store. Ms. Brown-Rice and Mr. Holt's voices became loud after they started drinking. Ms. Brown-Rice was "upset" and "angry" when Mr. Holt returned from the liquor store, but she did not leave to buy her own alcohol.

¶ 18    J.W. saw Ms. Brown-Rice on the floor in the middle of her bedroom, not near the closet, but facing toward it. J.W. also saw blood and Mr. Holt "hovering over" Ms. Brown-Rice with his

knees bent, holding a knife. J.W. saw Mr. Holt move the knife in Ms. Brown-Rice's direction multiple times, but did not see him cut or touch her with the knife. J.W. heard Mr. Holt say, "I told you to stop f*** ing with me."

¶ 19    T.R. testified he was 12 years old at the time of trial. Ms. Brown-Rice is his grandmother. At approximately 9 p.m. on October 2, 2015, he, J.W., and Ms. Brown-Rice were playing board games at Ms. Brown-Rice's house. At some point that night, Mr. Holt, whom T.R. identified in court, entered the house and went into a room. T.R. saw Ms. Brown-Rice leave to go to the store, return with a bottle of alcohol, and go into her room. Mr. Holt became mad because Ms. Brown-Rice did not bring anything back for him. He left the house and returned a short time later with a brown paper bag.

¶ 20    As T.R. and J.W. were preparing for bed, he heard "a big loud thump" from Ms. Brown-Rice's bedroom, so he and J.W. walked to Ms. Brown-Rice's bedroom. J.W. opened the door and walked into the room first. T.R. saw Ms. Brown-Rice on the floor in front of the bed, and saw Mr. Holt standing over her with a knife in his hand. Mr. Holt was to Ms. Brown-Rice's right side and made a stabbing motion with his right arm. T.R. did not see anything in Ms. Brown-Rice's hands when she was on the ground, and she did not make any movements in an attempt to hit Mr. Holt. T.R. and J.W. yelled at Mr. Holt to stop.

¶ 21    T.R. and J.W. returned to their room and locked the door. T.R. opened the bedroom door and saw Mr. Holt "burst out the door to go outside." Mr. Holt walked down the hallway and exited the house through the front door. Ten to twelve seconds later, Ms. Brown-Rice came after him, walking quickly, and "called 911 when she chased after him." She also called Mr. Holt's name. Ms. Brown-Rice came into T.R. and J.W.'s room and told J.W. to call 9-1-1.

¶ 22    On cross-examination, T.R. testified Ms. Brown-Rice was not drinking alcohol when the

family was playing games. When they finished playing games, Ms. Brown-Rice said she was going to the store and left the house. Ms. Brown-Rice returned and began drinking alcohol for the first time that night. When Mr. Holt returned from the store, Ms. Brown-Rice did not ask him if he bought any alcohol. When T.R. saw Ms. Brown-Rice on the floor of her bedroom, only her buttocks were touching the floor; her head, back, and legs were not. Her legs were bent, but not moving. Ms. Brown-Rice's arms were "flat." T.R. saw Mr. Holt use a knife to cut Ms. Brown-Rice's arm and legs.

¶ 23    Dr. Mohmedvasim Momin, a resident in oral/maxillofacial surgery, treated Ms. Brown-Rice at Christ Hospital on October 2, 2015. Ms. Brown-Rice came in through the emergency department due to a 12-centimenter laceration extending from her chin to the right side of her neck, stab wounds to her left arm and left thigh, and a stellate (star-shaped or radiating) laceration of her cheek. The neck laceration cut through Ms. Brown-Rice's skin and the layer of fatty tissue below the skin, down to the level of muscle tissue. The trachea, or airway, was a major vital structure in the area of Ms. Brown-Rice's neck laceration, and Dr. Momin was concerned that if the laceration was deep enough to injure Ms. Brown-Rice's trachea, she could have bled to death. He testified that, "[i]f the trachea was in any way injured or anything, most likely she wouldn't have made it to the hospital." When the trachea is injured, blood goes through the trachea and into the lungs, causing the victim to drown in her own blood.

¶ 24    Ms. Brown-Rice had alcohol in her system when Dr. Momin evaluated her. He performed surgery on Ms. Brown-Rice's neck laceration, closing two to three layers of tissue with stitches. Ms. Brown-Rice would likely have a permanent scar due to the size and depth of the laceration.

¶ 25    In a series of photographs, Dr. Momin identified the laceration to Ms. Brown-Rice's chin and neck, the undersides and back sides of her hands, and the "stab wounds" to her left cheek,

upper left arm, and left thigh. He also identified a photograph of Ms. Brown-Rice as she appeared after he stitched her chin and neck laceration. This photograph, which was moved into evidence, depicts stitches running from the center of Ms. Brown-Rice's chin to the underside of her right jawbone.

¶ 26    On cross-examination, Dr. Momin testified Ms. Brown-Rice's chin and neck laceration did not reach the level of the bone, and her trachea was not injured. A toxicology test indicated Ms. Brown-Rice's blood-alcohol level was 0.223, which was considered "abnormal" and one level above "high." Ms. Brown-Rice did not complain of, and Dr. Momin did not treat her for, any injury to her head. She did not indicate her head had been in contact with a wall.

¶ 27    The State rested, and Mr. Holt moved for a directed finding. The court granted the motion with respect to the aggravated domestic battery causing permanent disability count (720 ILCS 5/12-3.3(a) (West 2014)), finding the State presented no evidence of permanent disability to Ms. Brown-Rice. Mr. Holt's motion was otherwise denied.

¶ 28    Mr. Holt testified on his own behalf. He lived with Ms. Brown-Rice in October 2015. When he finished work at 3 p.m. on October 2, 2015, Ms. Brown-Rice and her niece picked him up and drove him to the liquor store, where he bought a half-pint of whiskey for himself, and a half-pint of cognac and a six-pack of beer for Ms. Brown-Rice.

¶ 29    Approximately 25 minutes after arriving at their house, Mr. Holt and Ms. Brown-Rice began drinking. T.R. arrived approximately two hours later; Mr. Holt and Ms. Brown-Rice were still drinking at that point. Ms. Brown-Rice, T.R., and J.W. played Monopoly in the kitchen while Mr. Holt played music in the living room. At some point when it was dark outside, Mr. Holt told Ms. Brown-Rice he was going to the store. He walked to the store, bought a half-pint of whiskey, and returned home.

¶ 30    When Mr. Holt returned from the store, Ms. Brown-Rice asked him if he bought her anything. Mr. Holt said, "no, it wasn't in the budget." Ms. Brown-Rice became angry, stormed past him, and went to their bedroom. Ms. Brown-Rice came back down the hallway and told J.W. and T.R. to get ready for bed. She stormed past Mr. Holt, slammed a door, and left to go to the store. The children went to bed, and Mr. Holt went to his and Ms. Brown-Rice's bedroom.

¶ 31    Ms. Brown-Rice returned home, entered her and Mr. Holt's bedroom, and closed the door. Mr. Holt was sitting at the foot of the bed watching television. Ms. Brown-Rice told Mr. Holt he was selfish. Mr. Holt told Ms. Brown-Rice she could not always have her way, and that they had a tight budget because Ms. Brown-Rice had been fired from her job the week prior. Ms. Brown-Rice became angry and called Mr. Holt selfish again. Mr. Holt told her he did not think their relationship was working and that he should leave. Ms. Brown-Rice said, "you can get out now."

¶ 32    Mr. Holt stood up and reached for the closet to get his coat when he felt a sharp pain across the upper right side of his back. He turned around and saw Ms. Brown-Rice holding a baseball bat. She swung the bat at his head, he ducked, and the bat hit the closet. Mr. Holt "became terrified" and asked Ms. Brown-Rice to put the bat down, but she swung the bat again and struck Mr. Holt's side. Mr. Holt took a small pocketknife out of his pocket and swung it at Ms. Brown-Rice, striking "her face or neck area." Ms. Brown-Rice became angry and held the bat over her head with both hands. Mr. Holt swung his knife again, and "may have cut her arm." Ms. Brown-Rice swung the bat, Mr. Holt blocked the bat with his left arm, and the bat fell out of her hand. Ms. Brown-Rice fell to the ground. Mr. Holt stood over her and said, "[s]top f *** ing with me." Ms. Brown-Rice kicked Mr. Holt, and Mr. Holt cut her leg because she was "still attacking" him. Mr. Holt tried to get out of the room because he was afraid and it seemed like Ms. Brown-Rice was still angry. In a photograph of the bedroom closet, which was admitted into evidence, Mr. Holt identified the

baseball bat Ms. Brown-Rice swung at him.

¶ 33    On cross-examination, Mr. Holt testified Ms. Brown-Rice swung the baseball bat at him at least four times. He first cut Ms. Brown-Rice under her chin, and confirmed the photograph of Ms. Brown-Rice's chin and neck laceration depicted the injury he caused. Ms. Brown-Rice was standing and swinging the bat at Mr. Holt when he cut her neck. Mr. Holt also cut the left side of Ms. Brown-Rice's face; that "may have" occurred at the same time he cut her chin and neck. Mr. Holt then cut Ms. Brown-Rice's arm one time. Mr. Holt initially testified Ms. Brown-Rice "probably" fell on her own, then testified he "deflected" her and pushed her. He denied hitting Ms. Brown-Rice. Ms. Brown-Rice sat on the floor and kicked Mr. Holt; Mr. Holt "slash[ed] her on the leg." Mr. Holt initially testified he did not recall whether J.W. and T.R. came into the bedroom, then testified they came into the bedroom when he was standing over Ms. Brown-Rice. Mr. Holt ran out of the house and down the street.

¶ 34    In a series of photographs, Mr. Holt identified himself as he appeared at the Dolton police station after his arrest on October 5, 2015. No injuries to Mr. Holt's face or head are visible, and Mr. Holt testified he had no injuries to any part of his facial area.

¶ 35    At the Dolton police station, Mr. Holt was interviewed by Detective Coleman. This interview was video recorded. At trial, Mr. Holt denied telling Detective Coleman he knocked Ms. Brown-Rice down and she fell into the closet and hit the wall. He acknowledged he did not tell Detective Coleman Ms. Brown-Rice hit him with a bat, and that he did tell Detective Coleman that he "just lost it." The video recording, which was admitted into evidence, shows that Detective Coleman asked Mr. Holt whether he knocked Ms. Brown-Rice down and she fell into the closet and hit the wall, and Mr. Holt responded, "[y]es."

¶ 36    On redirect examination, Mr. Holt testified he ran out of the house because he was being

chased. The portion of Detective Coleman's question to which he answered, "[y]es," was "when [Mr. Holt] pushed and she fell."

¶ 37    In rebuttal, the State presented a stipulation that Detective Coleman documented in his police report that Mr. Holt stated he punched Ms. Brown-Rice in the face.

¶ 38    In closing, defense counsel argued that Mr. Holt intended to defend himself from Ms. Brown-Rice's attack, not to kill her. In rebuttal, the State argued that the photographs of Ms. Brown-Rice's injuries established Mr. Holt's intent to kill because they showed knife wounds on her legs, face, neck, and palms, suggesting she was in a defensive posture, with her palms facing out, when Mr. Holt cut her. The State also noted the laceration to Ms. Brown-Rice's chin and neck was nearly fatal and argued the scene photographs and Mr. Holt's statements to police contradicted his claim Ms. Brown-Rice attacked him with a baseball bat.

¶ 39    The court found Mr. Holt guilty on all counts. In announcing its ruling, the court described the evidence as "absolutely positively overwhelming." It found that "only the most sinister intent would be associated with [the] wound that's depicted" in the photograph of Ms. Brown-Rice's chin and neck laceration, stating "[t]hat's an intent to kill." The court found Ms. Brown-Rice did not attack Mr. Holt and he was not afraid of her.

¶ 40    Mr. Holt filed a motion for a new trial, which was denied. In ruling on Mr. Holt's motion, the trial court stated it "found Ms. Ms. Brown-Rice's account of the attack to be very believable, very credible, very compelling." It also found Mr. Holt's claim Ms. Brown-Rice attacked him with a baseball bat "not credible." The court explained its finding of guilt was "based on the credibility of Ms. Brown-Rice, and the incredible testimony of [Mr. Holt]."

¶ 41    At the sentencing hearing, Mr. Holt submitted no corrections to the presentence investigation report (PSI). The PSI included information about Mr. Holt's family; his service in

the United States Army from 1982 to 1984, including his honorable discharge from the service; and the fact he had an employment history and was employed at the time of this incident. It included Mr. Holt's criminal background, which consisted of convictions for domestic assault (2004 – Nebraska), domestic battery (1996), and battery (1991).

¶ 42　In aggravation, the State presented Ms. Brown-Rice's written victim impact statement, which stated she had undergone seven surgeries and expected to have her finger amputated. The State also submitted Mr. Holt's 2004 felony conviction of "assault in the second degree" in Nebraska. In mitigation, defense counsel contended Mr. Holt had "no real [criminal] background" because his 2004 conviction was more than a decade old. Defense counsel noted Mr. Holt's parents were in court and supported him. He described Mr. Holt as a "family man" with rehabilitative potential, and requested the minimum sentence. In allocution, Mr. Holt stated he was "sorry for [his] behavior" and he "should have handled it differently."

¶ 43　The court merged the counts and sentenced Mr. Holt to 12 years in prison for attempted first degree murder. In announcing its ruling, the court described this case as "a whisper away" from first degree murder itself, and characterized the chin and neck laceration Mr. Holt inflicted upon Ms. Brown-Rice as "ghastly."

¶ 44　Mr. Holt filed a motion to reconsider sentence, which was denied.

¶ 45　　　　　　　　　　　II. JURISDICTION

¶ 46　Mr. Holt's motion to reconsider sentence was denied on August 29, 2018, and he timely filed his notice of appeal on September 24, 2018. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 47                                    III. ANALYSIS

¶ 48                     A. The Evidence Was Sufficient to Show Intent

¶ 49    On appeal, Mr. Holt first challenges his conviction for attempted first degree murder (720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a) (West 2014)), arguing the State failed to prove he intended to kill Ms. Brown-Rice. When a defendant challenges the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37. We do not retry a defendant or substitute our judgment for that of the trier of fact with respect to the weight of the evidence or the credibility of witnesses. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." (Internal citations omitted.) *Id.* On review, we will not reverse a conviction unless the evidence is so improbable or unsatisfactory that there is a reasonable doubt as to the defendant's guilt. *Hardman*, 2017 IL 121453, ¶ 37. We will not reverse simply because a defendant claims the evidence was contradictory or a witness was not credible. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 50    Mr. Holt was charged with attempted first degree murder for stabbing Ms. Brown-Rice with intent to kill. 720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014). To sustain this charge, the State had to prove beyond a reasonable doubt that Mr. Holt (1) "performed an act constituting a substantial step toward the commission of murder," and (2) "possessed the criminal intent to kill the victim." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52; see also 720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014). Mr. Holt only challenges the State's

proof of his intent to kill.

¶ 51    Attempted murder is a specific intent offense, so the State had to prove Mr. Holt had the specific intent to kill. See *Viramontes*, 2017 IL App (1st) 142085, ¶ 52. "Intent is a state of mind which can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred." *People v. Brown*, 2015 IL App (1st) 131873, ¶ 14. The nature and extent of the victim's injuries may also be evidence of the defendant's intent to kill. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 59. There is a presumption of intent to kill where one voluntarily and willfully commits an act that has a natural tendency to destroy another's life. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39. "It falls to the trier of fact to determine if the requisite intent to kill existed, and that determination will not be disturbed on appeal unless there is a reasonable doubt as to [the] defendant's guilt." *Id.*

¶ 52    There is no doubt that a rational trier of fact could find that Mr. Holt intended to kill Ms. Brown-Rice. Ms. Brown-Rice's testimony, which the trial court found credible, established Mr. Holt attacked her with a knife when she was unarmed and cut her multiple times. The photographs of Ms. Brown-Rice's injuries established Mr. Holt caused an open laceration running from the center of Ms. Brown-Rice's chin to the underside of her right jawbone, near where her head connects to her neck. Dr. Momin's testimony established the nearly fatal nature of this laceration. He explained the laceration Mr. Holt caused was near Ms. Brown-Rice's trachea, approximately 12 centimers long, and passed through two to three levels of tissue. Had this laceration struck Ms. Brown-Rice's trachea, she likely would have died before reaching the hospital. The wounds to Ms. Brown-Rice's cheek, arm, and leg are further evidence of Mr. Holt's intent to kill, as they are relatively deep and caused significant bleeding. They establish Mr. Holt continued to cut Ms.

Brown-Rice even after cutting her chin and neck, when she was on the floor trying to shield herself from the knife with her hands.

¶ 53    The court credited Ms. Brown-Rice's version of events, which established she was unarmed when Mr. Holt cut her neck. The trial court's finding Mr. Holt intended to kill Ms. Brown-Rice was reasonable and supported by the evidence.

¶ 54    Mr. Holt argues the State failed to prove his intent to kill Ms. Brown-Rice because (1) what occurred in the bedroom "boiled down to a he-said, she-said" credibility contest, (2) Ms. Brown-Rice was too intoxicated at the time of the incident for her testimony to be credible, and (3) there was no evidence Mr. Holt knew cutting Ms. Brown-Rice's neck could kill her. To the extent this case was a credibility contest, that is no basis for us to disturb the trial court's ruling. We are prohibited from substituting our judgment of the witnesses' credibility for that of the trial court. *Sutherland*, 223 Ill. 2d at 242.

¶ 55    Mr. Holt's contention regarding Ms. Brown-Rice's intoxication is explicitly a credibility argument, as Mr. Holt claims "Ms. Brown-Rice's blood alcohol level severely impacts her credibility." We cannot find Ms. Brown-Rice incredible when the trial court explicitly found her credible. See *Id.* In addition, Ms. Brown-Rice's testimony was corroborated by the testimony of two sober eyewitnesses, J.W. and T.R. Both witnesses essentially testified Mr. Holt was the aggressor and Ms. Brown-Rice was unarmed and trying to defend herself from him.

¶ 56    To the extent that Mr. Holt's brief relies on evidence about the physiological effects of a high blood-alcohol level, citing www.alcohol.org., no such evidence was introduced at trial and it is not part of the record on appeal, so we will not consider it. See *People v. Magee*, 374 Ill. App. 3d 1024, 1030 (2007) (striking portions of the defendant's brief that discussed psychological studies because they were not presented at trial and were not part of the record on appeal).

¶ 57   Mr. Holt also argues "there is no evidence that [he] knew that a wound to [the neck] could hit the trachea and thereby cause death," but the State did not have to prove Mr. Holt intended to injure Ms. Brown-Rice's trachea specifically. See 720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014). The State established Mr. Holt caused an injury that had a natural tendency to destroy Ms. Brown-Rice's life; namely, a deep knife wound to her neck. That is sufficient to establish Mr. Holt's intent to kill. See *Petermon*, 2014 IL App (1st) 113536, ¶ 39. The trier of fact was free to reject Mr. Holt's argument as contrary to common experience and knowledge (see *People v. Martin*, 401 Ill. App. 3d 315, 322 (2010)), and that is what the trial court did.

¶ 58   We find the cases relied upon by Mr. Holt to be distinguishable because none of them involved a defendant who inflicted a deep knife wound to a victim's neck area. See *People v. Garrett*, 216 Ill. App. 3d 348, 350-51 (1991) (no knife used); *People v. Jones*, 184 Ill. App. 3d 412, 415-16 (1989) (same); *People v. Brown*, 2015 IL App (1st) 131873, ¶ 16 (only superficial cuts to victim's back); *People v. Thomas*, 127 Ill. App. 2d 444, 446-47 (1970) (victim stabbed in shoulder). Accordingly, we affirm Mr. Holt's conviction for attempted first degree murder.

¶ 59                    B. The Sentence Is Not Excessive

¶ 60   Mr. Holt also challenges his 12-year sentence, arguing it is excessive because (1) of the nature of the offense, (2) he was honorably discharged from the United States Army in 1984, (3) he led a "law-abiding life" for more than 10 years prior to this incident, (4) he was gainfully employed at the time of the incident, and (5) he showed remorse during allocution. He asks us to reduce his sentence to the minimum of six years for attempted first degree murder.

¶ 61   A trial court's sentencing decision is entitled to great deference, and we will not disturb a sentencing decision absent an abuse of discretion by the trial court. *People v. Snyder*, 2011 IL 111382, ¶ 36. A sentence that falls within the statutory guidelines is presumed to be proper, and

only constitutes an abuse of discretion if the sentence is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.*

¶ 62    In determining a sentence, the most important factor is the seriousness of the crime. *People v. Alexander*, 239 Ill. 2d 205, 214 (2010). Factors in mitigation include, in relevant part, the defendant's lack of criminal activity for a substantial period before the offense at issue and the defendant's attitude and character indicating he is unlikely to reoffend. 730 ILCS 5/5-5-3.1(a)(7), (9) (West 2018). Factors in aggravation include the defendant threatening or causing serious harm; the defendant's criminal history; and whether the sentence is necessary to deter others. 730 ILCS 5/5-5-3.2(a)(1),(3),(7) (West 2018). The trial court may also consider a defendant's character, credibility, social environment, age, habits, as well as the nature and circumstances of the offense. *People v. Minor*, 2019 IL App (3d) 180171, ¶ 27. The defendant's rehabilitative potential is relevant, but is not entitled to greater weight than the seriousness of the offense. *Alexander*, 239 Ill. 2d at 214.

¶ 63    The trial court may not disregard mitigating evidence, but it may determine the weight of mitigating evidence. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. The presence of mitigating factors does not require a minimum sentence and does not preclude a maximum sentence. *Id.* Upon review, we presume the trial court considered all of the relevant mitigating factors, and a defendant must present affirmative record evidence that the trial court failed to consider such factors to overcome that presumption. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51. We cannot substitute our judgment for that of the trial court simply because we might have weighed the sentencing factors differently. *People v. Alvarez*, 2012 IL App (1st) 092119, ¶ 61.

¶ 64    The sentencing range for attempted first degree murder is that of a Class X felony, which

is 6 to 30 years. 720 ILCS 5/8-4(c)(1) (West 2018); 730 ILCS 5/5-4.5-25(a) (West 2018). The trial court imposed a sentence of 12 years, within the statutory guidelines. Therefore, we presume the trial court's sentence was proper. See *Snyder*, 2011 IL 111382, ¶ 36. Mr. Holt can only overcome this presumption by showing his sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. See *Id.*

¶ 65    Mr. Holt has not made such a showing. As the court noted at the sentencing hearing, Mr. Holt came close to committing first degree murder; had he made a slightly deeper wound in Ms. Brown-Rice's neck, she likely would have died. Moreover, this was a particularly violent form of attempted murder in which Mr. Holt caused multiple serious knife wounds to several parts of Ms. Brown-Rice's body, requiring seven surgeries and more than 100 stitches to repair, and putting Ms. Brown-Rice's finger at risk of amputation. We note Mr. Holt's sentence is closer to the minimum for attempted first degree murder than it is to the maximum. We cannot conclude that such a sentence is manifestly disproportionate to the nature of the offense, especially given the facts of this case.

¶ 66    Mr. Holt argues "the court failed to balance the retributive and rehabilitative purpose[s] of its punishment." To the extent Mr. Holt asks us to reweigh the aggravating and mitigating evidence, the law prohibits us from doing so. See *Alvarez*, 2012 IL App (1st) 092119, ¶ 61. Moreover, the record does not establish the trial court disregarded the mitigating factors Mr. Holt cites. At the sentencing hearing, the trial court had received Mr. Holt's PSI, which included information about his military service, criminal background, and employment history. We presume the trial court considered evidence in the PSI (*People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 20), and Mr. Holt has presented nothing to rebut that presumption. Mr. Holt also raised essentially the same arguments at the sentencing hearing as he does on appeal. Thus, the trial court not only read

the mitigating evidence in the PSI, it also heard the mitigating evidence argued and is presumed to have considered it. Thus, Mr. Holt has failed to establish the trial court disregarded any mitigating evidence.

¶ 67 Finally, Mr. Holt argues his sentence was excessive because he showed remorse during allocution. A defendant's remorse, or lack thereof, is an important factor for the trial court to consider at sentencing. *People v. Powell*, 2013 IL App (1st) 111654, ¶ 34. The record establishes the trial court listened to and considered Mr. Holt's expression of remorse during allocution. Thus, there is no basis for us to conclude the trial court disregarded Mr. Holt's expression of remorse, and we defer to the weight the trial court gave to that expression of remorse in fashioning his sentence. See *Alvarez*, 2012 IL App (1st) 092119, ¶ 61. Accordingly, we do not find the trial court abused its discretion in passing sentence and we affirm Mr. Holt's sentence of 12 years in prison.

¶ 68                                IV. CONCLUSION

¶ 69 For the foregoing reasons, we affirm the trial court's judgment.

¶ 70 Affirmed.